# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of:<br><br>Information associated with **bobmalkin@gmail.com**, that is stored at premises owned, maintained, controlled, or operated by Google, LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California. | )<br>)<br>)<br>)<br>)<br>)<br>)     Case No. ___18-M-131 (DEJ)___ |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A-1

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:  Title 21, United States Code, Sections 841(a)(1), (b)(1)(B) and 846; Title 18, United States Code, Section 1956(h).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

___ATF Special Agent Richard Connors___
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: ___Aug. 16, 2018___

_____
*Judge's signature*

City and State: ___Milwaukee, Wisconsin___

___Hon. David E. Jones, U.S. Magistrate Judge___
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, **Richard Connors**, being first duly sworn, hereby depose and state as follows:

## AGENT BACKGROUND AND INFORMATION

1.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises controlled by Google, an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043. The information to be searched is described in the following paragraphs and in Attachments A1-3. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") assigned to the Milwaukee Field Office since October of 2015. I have been employed as a full time law enforcement officer for over two and a half years. I have received training at the Federal Law Enforcement Training Center in Glynco, GA. I attended the Criminal Investigator Training Program, as well as ATF's Special Agent Training Program. I have received training in the investigation of unlawful possession of firearms, the unlawful transfer of firearms, and the unlawful dealing in firearms without a dealers' license. Prior to becoming a Special Agent with the ATF, I received two (2) bachelor's degrees from

1

Northern Illinois University in the fields of Sociology and International Relations. I have received a Master's degree from Northern Illinois University in the field of American Government.

3.      I have received training in the investigation of firearm and drug trafficking. Based on my training, experience, and participation in firearm trafficking investigations, I know and/or have observed the following:

    a.  I have utilized informants to investigate firearm and drug trafficking. Through informant interviews and debriefings of individuals involved in those offenses, I have learned about the manner in which individuals and organizations distribute these items in Wisconsin and elsewhere;

    b.  I have also relied on informants to obtain firearms (as opposed to licensed gun dealers) and controlled substances from individuals on the streets, known as a controlled purchase;

    c.  I have experience conducting street surveillance of individuals engaged in firearm and drug trafficking. I have participated in the execution of numerous search warrants where drugs, firearms, ammunition, and magazines have been seized;

    d.  I am familiar with the language utilized over the telephone to discuss firearm and drug trafficking, and know that the language is often limited, guarded, and coded;

    e.  I know that firearm and drug traffickers often use electronic equipment to conduct these operations;

    f.  I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

    g.  I know that firearm and drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate these and related offenses; and

    h.  I know that firearm and drug traffickers often use proceeds to purchase assets such as vehicles, property, jewelry, and narcotics. I also know that firearm and drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement officials I also know what firearm and drug traffickers may keep photographs of these items on electronic devices.

2

4.    I have participated in multiple firearm and drug trafficking investigations that involved the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these computers, cellular phones, cameras, and other digital storage devices. In many occasions, this electronic data has provided evidence of the crimes being investigated and corroborated information already known or suspected by law enforcement.

5.    This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.

6.    This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.    Based on my training and experience and the facts as set forth in this affidavit, I submit there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B) and 846, Conspiracy to Possess with Intent to Distribute and to Distribute in Excess of 100 Kilograms of Marijuana, a Schedule I Controlled Substance, and Title 18, United States Code, Sections 1956(h) and 2, Money Laundering and Conspiracy to Commit Money Laundering (the "Subject Offenses"), have been committed by a person or persons using the accounts in Attachments A1-3. There is also probable cause to search the information described in Attachments A1-3 for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

3

## JURISDICTION

8.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by Title 18, United States Code, Sections 2711 and 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." Title 18, United States Code, Section 2711(3)(A)(i).

## PROBABLE CAUSE

### A.     Background of Investigation

11.     In 2017, members of the Milwaukee, WI Police Department initiated an investigation into a large-scale marijuana drug trafficking organization (DTO) led by Josef K. Habib and others. Habib acquired large shipments of marijuana from out of state sources, which Habib then distributed in the greater Milwaukee area. Habib was also identified as utilizing stash locations in the greater Milwaukee area, including in the cities of Milwaukee and Greenfield, WI.

12.     On January 8, 2018, law enforcement conducted surveillance at an identified stash location at 4100 W. Hillcrest Drive, apartment #207, in Greenfield, WI and observed a vehicle known to be driven by Habib, a black Nissan Maxima, WI license 242LWL, parked in a visitor parking stall at 4100 W. Hillcrest Drive, near the garage for apartment #207. The overhead garage door on the attached garage for #207 was fully open.

13.     Law enforcement subsequently observed a Toyota Highlander vehicle with VA license plates arrive and drive into the open garage for apartment #207. The garage door then immediately closed.

14.     Approximately 20 minutes later, the overhead garage corresponding to apartment

4

#207 opened, and law enforcement observed a white male enter the driver's seat of the Toyota; Habib stood in front of the Toyota. The Toyota pulled out and drove away. Habib entered the Nissan Maxima and drove it into the garage for apartment #207, and the overhead door closed.

15.     Approximately 25 minutes later, the overhead door of the garage for apartment #207 again opened, and the Nissan Maxima exited.  Law enforcement observed that Habib was the driver and sole occupant of the vehicle.

16.     A traffic stop was conducted of the Nissan Maxima, driven by Habib. Law enforcement authorities detected an odor of marijuana emanating from the vehicle, and observed a large black plastic garbage bag on the rear passenger seat. Based upon the earlier investigation, law enforcement believed that Habib used these garbage bags to transport quantities of marijuana. A search of the garbage bag revealed foil sealed packages each of which contained suspected marijuana.

17.     A complete search of the Nissan Maxima revealed a total of approximately 64 pounds of suspected marijuana within the trunk and rear passenger area of the vehicle. A field test conducted on the suspected marijuana yielded positive results for the presence of THC.

18.     On January 8, 2018, law enforcement authorities also conducted a stop and search of the Toyota Highlander.  This search revealed approximately 160 pounds of marijuana and in excess of $300,000 in U.S. currency.

19.     Search warrants were subsequently executed on January 8, 2018 at 4100 W. Hillcrest Drive, apartment #207, Greenfield, WI, believed to be the stash location, and at the residence of Habib, located at 117 W. Walker Street, apartment #303, Milwaukee, WI.

20.     Law enforcement found approximately 206 pounds of marijuana at 4100 W.

5

Hillcrest Drive, apartment #207. Additionally, law enforcement located and seized approximately 16 pounds of marijuana, in excess of $21,500 in U.S. currency, and a loaded .40 caliber pistol from 117 W. Walker Street, apartment #303. Also seized were items consistent with the packaging and distribution of controlled substances.

21.     The majority of the marijuana seized was contained in mylar vacuum sealed bags, some within black plastic construction bags.

22.     Rental documents obtained for the stash location at 4100 W. Hillcrest Drive revealed that it had been rented in 2017 by Fredric Birault, and an individual named Larry Peters was the contact name for Birault, with an email address contact of **larrygoeshardaf@gmail.com**. Larry Peters was subsequently determined to be an alias name of Lev Reys, and the email address **larrygoeshardaf@gmail.com** was determined to be an email address associated with Lev Reys. The subscriber for utilities in the stash apartment were in the name of Birault.

23.     When Habib moved to Milwaukee in approximately December 2016, law enforcement learned that Habib resided at 814 E. Kilbourn Ave., Milwaukee, WI. The subscriber for utilities at the Kilbourn Avenue location were in the name of Robert Malkin. Habib resided there until February, 2017 when he moved to another stash location at 4250 S. Ravinia Dr., #103, Greenfield, WI.

24.     Rental documents obtained for 4250 S. Ravinia Dr., #103, Greenfield, WI, located in the same apartment complex as 4100 W. Hillcrest Drive #207, revealed that the Ravinia Drive location was rented by Robert Malkin February 2017.   In the rental application, which was submitted from the email address **bobmalkin@gmail.com**, Robert Malkin identified his employer as Malkin Properties.  For the rental application credit/income fields on the application, Malkin

6

supplied copies of three checking account statements for a joint account at JPMorgan Chase Bank, in the names Robert Malkin and Sydney Malkin, Robert's daughter, Account #***0130. The account mailing address on the two most recent statements (December 2016 and February 2017), listed 226 W. Ojai Ave., #101, Ojai, CA. The address on the statement for January of 2016, which may have been provided in error, listed an address of 3639 W. Harbor Blvd., #201, Ventura, CA. The insurance for the apartment rental was under the names Robert Malkin and Sydney Malkin, with an address of 226 W. Ojai Ave., #101, Ojai, CA. Robert Malkin paid the initial monthly rent of $1,130 for this stash location in money orders. The utilities were subscribed to in Sydney Malkin's name at the Ravinia Drive apartment.

25.     On March 1, 2017, Robert Malkin sent an email via **bobmalkin@gmail.com** regarding CORT Furniture located at 161 S. Gary Avenue, Carol Stream, Illinois, stating "This email is intended to give permission to CORT Furniture to enter my apartment #103, [at 4250 S. Ravinia Drive] on March 8 and March 9, 2017. If you have any questions you can contact me at 805-279-5393."

26.     On March 9, 2017, Robert Malkin electronically signed the lease for 4250 S. Ravinia Drive, #103, Greenfield, Wisconsin. The lease covered the date of March 9, 2017 through September 8, 2017.

27.     Rental documents obtained for the residence of Josef Habib, 114 W. Walker Street, Milwaukee revealed that the apartment had been rented by Corianne Markowski, the girlfriend of Josef Habib, in April 2017. In the rental application, Markowski listed her employment since 2012 as Malkin Properties, 3639 W. Harbor Blvd., #201, Ventura, CA. Robert Malkin was listed as Markowski's supervisor with a contact telephone number of 805-279-5393, a number known to

7

be utilized by Robert Malkin. Markowski also listed her previous residence as an address known by law enforcement through database checks as a residence owned by Malkin Properties in West Mifflin, PA.

### B. Historical Information

28.  In January 2018, a confidential informant (CI) began cooperating in the continuing investigation into the DTO. The CI provided information about the membership, structure, and customs of the interstate marijuana DTO emanating in CA. The CI's information has been corroborated by information obtained from various pubic databases, documents obtained during the investigation, asset and ownership records, law enforcement records, physical observations, and review of recorded jail calls. Such information will be detailed below. The CI's information has never been found to be false or misleading. The CI has no criminal record and is receiving consideration in connection with a pending drug case from the United States Attorney's Office for his/her cooperation with law enforcement. The CI has also received monetary compensation in the form of covered expenses in exchange for his/her cooperation with law enforcement. For these reasons, I consider the CI to be reliable.

29.  The CI stated an individual named Bob, subsequently identified as Robert Malkin, obtained in excess of 1,000-pound quantities of marijuana in CA, which were subsequently transported by semi-tractor trailer to a location in MD. Parts of the shipments were then distributed to various locations in the U.S., including Virginia/Washington D.C. areas; Pittsburgh, PA; North Carolina; and Milwaukee, WI. The CI further stated Robert Malkin operates a property management company and is suspected of laundering drug proceeds through the company by purchasing properties.

8

30.     In 2013 and 2014, the United States Postal Service seized and forfeited mailed parcels from Robert Malkin to his wife, Susan Malkin, which contained large sums of currency. In 2013, $25,000 was seized, and in 2014, an additional parcel containing over $149,000 was seized. Based upon a civil forfeiture complaint filed in U.S. District Court, Central District of CA, in July 2014, the 2014 parcel was shipped by Robert Malkin in Clairton, PA to Susan Malkin, at a UPS store in Ventura, CA. The telephone number used by Robert Malkin on the parcel mailing in 2014 was 805-279-5393.

31.     The CI further provided information regarding the hierarchy of the DTO. According to the CI, Robert Malkin is the financier of the marijuana trafficking organization. Lev Reys was in charge of the transportation of the marijuana from CA to MD, and other locales. Seth Jacobs held a similar status in the organization as the main distributor/overseer of the Virginia/MD/D.C. marijuana distribution. Joseph Habib directed aspects of the East Coast operation along with running the Milwaukee market. Nahom Hagos[1] and Alae Arbi sold quantities of the shipments in the MD/Alexandria Virginia and Washington D.C. areas on behalf of the organization.

32.     In 2016, Seth Jacobs was named in a DEA investigation when law enforcement seized $29,950 in suspected drug proceeds from him at Dulles airport.

_____

[1]   In 2011, Nahom Hagos was one of 18 individuals charged by the U.S. District Court in Alexandria, Virginia with conspiracy to distribute marijuana. The individuals obtained shipments of marijuana from California and distributed it in that district along with at numerous college campuses in other states. Hagos pled guilty and was sentenced to 18 months prison along with three years of supervised release.

33.     During the course of the investigation, case agents learned that Jason Malkin also participated in the operation logistics of the DTO as set forth below.

34.     In November 2017, Lev Reys recruited the CI to move into and reside at a stash location in Germantown, MD. The CI met Lev Reys through a mutual associate, Fredric Birault, both of whom the CI knew to reside in CA. Birault had advised the CI that Reys was looking for someone to assist in the organization's interstate marijuana trafficking organization and oversee the marijuana stash and off load locations in MD, and Reys would pay the individual for those duties. Birault stated he declined the offer as Birault did not wish to move to MD. Reys advised the CI that a coconspirator named "Scotty," subsequently identified by law enforcement as Scott Jungwirth, had occupied the MD stash house just before the CI. Reys stated Jungwirth had been tasked with the same duties as the CI, but Jungwirth no longer occupied the stash house. Jungwirth had a quantity of marijuana shipped or delivered to the stash house. Having the marijuana shipped to the stash house was against the rules of the organization.  The organization required that the location of the stash house be kept secret; mailings to the stash house were not allowed to maintain the integrity of the organizations' use of the location as a stash house.

35.     According to the CI, the semi-tractor trailer shipments of marijuana that arrived from CA were off loaded from hidden compartments in the trailer at a hangar in Hagerstown, MD. Two locked large steel construction bins in the hangar were used to store marijuana when the trailers were picked up.

36.     The marijuana was then transported for re-packaging and distribution at the stash house in Germantown, MD. The CI was responsible for oversight of the shipments of marijuana upon their arrival in MD by keeping accurate counts of the weights of marijuana that were shipped

10

to the hangar and processed at the stash house.

37.     The CI was in charge of the inventory of the bags in the hangar and upon obtaining quantities of marijuana, the CI resealed and renumbered the bags with the current accurate count of the bags/pounds. The marijuana was packaged in mylar bags and vacuum sealed bags inside black plastic construction bags.

38.     The CI was also responsible for collecting, processing, and packaging large quantities of currency from various coconspirators that represented the proceeds from marijuana sales.

39.     After the CI moved to the stash house in Germantown, MD just before Thanksgiving 2017, Reys took the CI shopping for house supplies and food at a Wal-Mart near Germantown. A day or two later, Reys and the CI went to CubeSmart in Gaithersburg where an interior storage unit, #4030, was rented. Reys told the CI to put the rental in the CI's name, and Reys paid for the rental. Reys then purchased a Rigid steel construction bin. Reys and the CI transported it to CubeSmart and put it in the storage unit. Reys provided the CI with the spare keys for the storage unit lock and two padlocks that he put on the construction bin.

40.     According to the CI, the storage unit and bin were used for storing the U.S. currency that the DTO accumulated through its marijuana sales before it was transferred to the hangar. At the hangar, the cash was loaded into hidden compartments in the semi-trailers for transport to CA.

41.     The DTO used hidden compartments in the semi-trailers to transport the marijuana and marijuana proceeds. The trailer transporting marijuana from CA to MD contained what appeared to be lumber stacks, but the lumber stacks were hollowed out on the inside with the top layer hinged so that the entire compartment could be accessed. The other trailer, which transported

11

the currency back to CA, contained a fake movie production set with equipment inside, restrooms, generators, and other similar detailing. Currency was hidden in a large steel Rigid construction bin in the front of the trailer, which area could only be easily accessed by crawling under the generator mounted near the rear trailer door and over other equipment.

42.   The truck drivers hauling the trailers allegedly did not know that they were transporting either marijuana or money. Reys stated that they would never use the same driver more than once.

43.   The CI observed approximately 30-40 black plastic construction bags within the fake lumber stacks and each construction bag normally contained six to eight mylar bags, each of which generally contained five pounds of marijuana. The CI stated that the shipments from CA contained approximately 1,200-1,600 pounds per shipment.

44.   The CI was present at the hangar on approximately four occasions when semi-trailers were delivered or taken out, and Reys was present on two occasions.

45.   On approximately three other occasions, the CI went to the hangar alone with instructions from Jacobs to bring back five to six contractor bags of marijuana to the MD stash house.

46.   The CI identified Josef Habib as a Milwaukee based distributor for the DTO. The CI had obtained large quantities of U.S. currency from Habib, which the CI then transported back to MD.

47.   The CI first met Habib when Jacobs and Reys directed the CI to fly to Milwaukee. The CI flew to Milwaukee on Southwest Airlines from Baltimore and the CI rented a car, believed to be from Enterprise. The CI was directed to contact and meet with "Joe." The CI subsequently

12

met Habib by Hamburger Mary's in Milwaukee. Habib delivered money to the CI, and the CI observed that Habib drove a black car. The CI then drove the money to the stash house in Germantown, MD. On another occasion, the CI met Habib at the stash house in MD.

48.     The CI identified Lev Reys as a close associate of Robert Malkin. The CI stated Reys' role in the DTO was overseeing transportation of the shipments of marijuana from CA to MD and other locations. The CI stated Reys has told the CI that Reys' goal is to accumulate numerous properties in the Pittsburgh, PA area utilizing marijuana distribution proceeds and then accumulate further wealth through ownership and rental of the properties.

49.     The CI identified an individual named Seth, subsequently identified as Seth Jacobs, as a main MD/Virginia based distributor for the DTO who frequented the stash house in MD and oversaw a daily worker at the stash house.

50.     The CI retained receipts from the CI's trips which the CI then provided to Jacobs. Jacobs reimbursed the CI with cash for the CI's drug-related expenses.

51.     The CI also identified an individual named Alae/Elae subsequently identified as Alae Arbi, and an individual named Nash, subsequently identified as Nahom Hagos, as individuals that frequented the stash house in Germantown, MD and obtained multi-pound quantities of marijuana weekly, which Arbi and Hagos sold in the MD/Virginia/Washington D.C. areas on behalf of the DTO.

52.     Arbi normally came to the stash house with Seth Jacobs and ran errands for him. Arbi also ran a marijuana delivery service for Jacobs in the Washington, D.C. area. Jacobs and Arbi had a business name on Weed Maps, an app that each of them had installed on their cell phones. Arbi also came to the stash house at night to smoke marijuana.

13

53.    On average, Hagos came to the stash house every few days, sometimes multiple days in a row, and the CI overheard Hagos telling a stash house worker that Hagos needed 40 units of something, a few units of something else, which the CI knew to be Hagos obtaining pounds of different strains of marijuana.

54.    The CI identified the CI's two cellular telephone numbers. The CI also stated that a cellular telephone that the CI had left at the stash house in MD had been provided to the CI by Lev Reys in November 2017 as a cellular telephone number to utilize for contacting coconspirators in the DTO. The CI had changed cellular telephones due to issues with service.

55.    Reys and Jacobs told the CI that Jungwirth was an older white male. The CI was also told that Jungwirth, the individual previously performing the duties of the CI, previously drove the Toyota Highlander, and it was purchased as the transportation vehicle for Jungwirth. Subsequently, this vehicle was provided to the CI to use for deliveries and pickups, and other drug-related duties.

56.    A check on the title history of the Toyota Highlander revealed that it had been titled in the name Scott Jungwirth, 2014 Jewell Ln., Redding, CA on August 1, 2017. The vehicle title was then transferred into the name of the CI on November 21, 2017.

57.    The CI stated that on the day of Habib's arrest, Reys first directed the CI to stop at another stash location in Milwaukee, which the CI identified as 7992 N. 107th St., #6 Milwaukee. Prior to the CI's departure from Germantown, MD, Reys had given the CI a set of keys for the apartment.  Reys directed the CI to take the marijuana from the 107th Street location and deliver it to Habib. The CI estimated there were approximately 300 pounds of marijuana at the stash house on 107th street.

14

58.     The CI then took the marijuana to Habib at the 4100 W. Hillcrest Dr. location. Habib examined the different strains of marijuana and took approximately 140 pounds of the marijuana, but left the CI with the remaining amount. Habib also put the bags and boxes containing the U.S. currency in the Highlander for the CI to take back to MD.

59.     The CI was uncertain about what to do with the marijuana as the CI had never driven marijuana that had already been delivered to another city back to the MD stash house. The CI attempted to contact Jacobs and Reys via the Telegram app they utilized on their cellphones, but neither answered.

**C.     Continuing Investigation**

60.     On January 9, 2018, case agents conducted a consent search at 7992 N. 107th St., #6, Milwaukee, WI.  Law enforcement observed that no one resided in the apartment. Items observed and seized included plug-in air fresheners, a box of rubber gloves, and loose locksets for doors. The air fresheners were the same type as what had been observed at the stash house at 4100 Hillcrest Dr., #207.

61.     Records received from the property management company for 7992 N. 107th St., #6, Milwaukee revealed that the rental application was in the name Fredric Birault, 23907 Windward Ln., Valencia, CA with an application date of September 20, 2017 and rental date starting October 20, 2017. An email address of **larrygoeshardaf@gmail.com** was provided along with a verification of income letter from a Larry Peterson, telephone number 818-299-0267, email address **larrygoeshardaf@gmail.com**, stating that Birault was employed by Oasis Management, Beverly Hills, CA as a property manager since 2012.  The telephone number and email address are known to be used by Reys.

15

62.    On January 9, 2018, law enforcement from Montgomery County Sheriff's Department executed a search warrant at the stash house in Germantown, MD based upon the information developed in this investigation. A search of the residence revealed evidence consistent with the information provided by the CI that the residence served as a stash location for the marijuana distribution organization. Law enforcement recovered thousands of unused vacuum sealed bags, marijuana remnants, a money counter, latex gloves, and the cellular telephone provided by Reys that the CI identified as located at the stash house.

63.    In January 2018, case agents traveled to MD with the CI and conducted a follow-up consent search at the stash house located in Germantown, MD utilizing the CI's keys. At that time, law enforcement seized additional items, including a crumpled Burke & Herbert Bank ATM debit card receipt dated December 10, 2017 from a branch at 6210 Interparcel Rd., Alexandria, VA from the basement, and paid parking stub, dated December 20, 2017, from a parking garage in Washington D.C. from the garbage.

64.    Bank records and parking management company records received via subpoena revealed that the debit card receipt corresponded to a bank account of Alae Arbi. The parking stub receipt was parking paid for using a credit card issued to Nahom Hagos.

65.    A review of records received from Burke & Herbert Bank reveal that the debit card ATM withdrawal receipt seized from the "stash house" in Germantown, MD, is tied to checking account number *4043, in the name of Alae Arbi of 7507 Shirley Hunter Way, Alexandria, Virginia 22315.

66.    Records received from Burke & Herbert Bank reveal that the debit card used for the charge on the parking stub receipt seized from the "stash house" in Germantown, MD, is a

16

match to a debit card for a checking account *1403, in the name of Nahom Hagos of 7704 Ousley Place, Alexandria, Virginia 22315.

67.     Law enforcement also conducted consent searches at the CubeSmart storage unit in Gaithersburg, MD and the rented warehouse hangar in Hagerstown, MD.

68.     Upon searching the storage unit, the special agents observed a Rigid steel construction bin inside the unit, which was padlocked.  A set of keys recovered from the stash house in Germantown, MD opened the locks on the bin. The bin was empty.

69.     A review of surveillance video received from CubeSmart showed Reys and the CI entering the storage unit in November 2017 on the day of the initial rental and a few days later. Both are observed on video unloading the Rigid steel construction bin from the Toyota Highlander and taking it inside the storage unit.

70.     Upon searching the warehouse hangar, a tractor-trailer was observed parked inside. The interior of the trailer contained two false lumber and plywood stacks. The top layer of false lumber was hinged on each stack, which revealed empty hollowed out compartments. There were also two additional Rigid steel construction bins in the warehouse hangar.

71.     A check on the CA license plate on the trailer in the hangar revealed that the trailer was registered to Fredric Birault, at 23907 Windward Ln., Valencia, CA.

72.     Subpoenaed records were obtained from World Wide Freight Carrier, LLC.  On April 9, 2018, Robert Malkin, from email address **bobmalkin@gmail.com**, communicated with an employee at World Wide Freight Carrier regarding "Trailer pick up." Robert Malkin requested "pick up" at "18238 shoalwater rd 21742," which case agents know is the address for the warehouse hanger previously identified by the CI, and examined by case agents.  Robert Malkin

17

provided a delivery address of "2509 N. Ventura Avenue, Ventura 93001." The shipping rate was listed as $4,895.00.

73. Rental documents obtained for the stash house in Germantown, MD revealed that the residence was rented by Robert Malkin in July 2017. Rental documents for the warehouse hangar revealed that it was also rented by Robert Malkin in September 2017.

74. During the week of January 8, 2018, an attorney contacted law enforcement and advised that an individual who identified himself by the name of "Seth" had contacted the attorney regarding the CI and inquired as to the attorney representing the CI. The attorney provided the telephone number that "Seth" called from as a "707" area code number. The CI stated the CI doesn't know any other individuals named Seth other than Seth Jacobs. The CI suspected that Jacobs was the individual that called the attorney because Reys had told the CI in the past that if the CI was ever arrested that the organization would obtain an attorney for the CI.

75. On July 24, 2018, United States Magistrate Judge Charles F. Eick in the Central District of California signed search warrants for multiple residences and locations including the residences of Robert Malkin at 5245 Neptune Square, Oxnard, CA; Sydney Malkin at 11756 Ventura Boulevard. Ojai, CA; and Lev Reys at 12203 Hartsook Street, Valley Village, CA and 247 3rd Avenue, Venice, CA. A warrant was also signed for Lev Reys' Safety Deposit Box held at U.S. Private Vaults, Inc. located in Beverly Hills, CA.

76. On July 25, 2018, law enforcement executed the search warrants. Items seized from the residence of Robert Malkin included in excess of $220,000 in cash, and seized from the residence of Sydney Malkin was in excess of $60,000 in cash and 60 one-ounce gold coins. Sydney Malkin stated she was safekeeping the cash and coins at her residence for her father, Robert

18

Malkin. Also seized from Sydney Malkin's safety deposit box, pursuant to a search warrant, were 84 one-ounce gold coins. Items seized from the residences of Lev Reys included in excess of $30,000, and seized from Lev Reys' safety deposit box was in excess of $742,000.

77.     Additionally, on July 24, 2018, United States Magistrate Judge William E. Duffin signed seizure warrants for two CitiBank accounts held in the name of or associated with Lev Reys, which resulted in the seizure of in excess of $198,000.

### D.     DTO's Methods of Communication

78.     The CI identified various telephone numbers and usernames of the coconspirators from an encrypted cellular telephone application called Telegram. This application allowed the coconspirators to contact one another to avoid detection from law enforcement because it provided a "secret chat" feature. The CI stated that the usernames the coconspirators utilized in the app were fictitious names that the various coconspirators had chosen. The CI stated all of the known individuals primarily used the secret chat and voice calling on the Telegram app. The individuals whom the CI identified also frequently changed cellular telephone numbers to avoid detection by law enforcement. The CI knew Jacobs carried three cellphones at a time, and Reys used more than one cellphone.

79.     Law enforcement reviewed the cellular telephone of the CI and the Telegram app on the CI's cellular telephone. The CI identified the following names and Telegram app contacts: a name of Joe with a fictitious name of Steven Trace and username @Ralfy434, Telegram app telephone number 414-888-0646 as the contact information for Josef Habib; the name Larry Peters and username @LarryPeters, Telegram app telephone number 818-299-0267 as the contact information for Lev Reys; a name Alle with no telegram telephone number saved as the username

19

for Arbi; a name "Ben," whom the CI identified as a daily stash house worker, with a fictitious name of @timwilliams (a/k/a Paul Ramon) with no telephone number saved as "Ben;" the name Bob with username name BM with no telephone number saved as Robert Malkin; and the name Seth with the fictitious username Rick Orozco as the username of Jacobs.

80.     Outgoing calls were observed to the Telegram usernames of Reys and Jacobs during the time period after the CI left Habib's 4100 W. Hillcrest Dr. stash location on January 7, 2018.

81.     There were also numerous secret chats between the CI and the other referenced user names.

82.     Law enforcement also observed numerous pictures time stamped December 21, 2017, of notebook pages containing handwritten notations of abbreviated names of marijuana strains with numbers next to the abbreviations on the CI's phone. The CI stated that they were pictures taken by the CI that the CI then sent to Reys and Jacobs documenting the pounds of various types of marijuana that was remaining on that date at the hangar. The CI had been directed to pick up a quantity of marijuana at the hangar and bring it back to the stash house in Germantown, MD.

83.     On January 25, 2018, law enforcement obtained search warrants from the Honorable Magistrate Judge William E. Duffin for the two cellular telephones of Habib, 414-888-1856 and 571-639-1582. A review of the telephones revealed contacts in Telegram with a name entered as Bdigi, telephone number 805-279-5393 (known to be the telephone number of Robert Malkin), and encrypted conversations between that number and Habib's cellular telephone. Additional telegram usernames were Paul Ramon with username @Timwilliams (Id'ed by the CI as the individual "Ben," whom the CI identified as a daily Maryland stash house worker) with calls

20

between the two.

84.    Law enforcement also observed numerous chats and secret chats between Habib's cell phone and other unidentifiable uernames on the Telegram app. Some of the chats contain pictures of notebook pages depicting handwritten drug ledgers, including various marijuana strains with numerical amounts and pages containing monetary amounts, including pages titled "Milw. Inventory," and D.C. Inventory with dollar amounts over $1,000,000. Some of these chats were with Paul Ramon.

85.    Database checks on the telephone number 805-279-5393 revealed the telephone number is listed to Robert Malkin.   Further records obtained through subpoenaed documents related to rental locations, banking and other records revealed Robert Malkin uses telephone number 805-279-5393.

**E.      Financial and Travel Information**

**<u>Financial Information</u>**

102.    Robert Malkin operates Malkin Properties LLC and database checks reveal that Malkin Properties manages and sells properties in southern CA and Pittsburgh, PA areas.  Database checks further reveal that Sydney Malkin is the Chief Executive Officer ("CEO") for both Malkin Properties, Inc. and Malkin Properties, LLC.  On July 25, 2018, Sydney Malkin was interviewed, at which time she stated that she owned Malkin Properties, Inc., but that Malkin Properties, LLC belonged to her father, Robery Malkin.

103.    A check through property ownership databases and subpoenaed records revealed that Lev Reys purchased four properties in Pittsburgh, PA in June and July 2015, three from Robert Malkin, and one from his son Andrew Malkin.

21

104. On or about May 23, 2017, Robert Malkin purchased a property at 840 Maple Lane in Garberville, CA in the name of ROBERT K. MALKIN & ASSOCIATES, INC. for $220,000. No mortgage was located for the property. REYS has traveled to Garberville on at least September 15, 2017, September 24, 2017, and October 6, 2017, as per his credit card transactions. Subpoenaed documents have also placed Jason Malkin and Scott Jungwirth in Garberville.

105. Subpoenaed bank and other financial accounts revealed that Robert Malkin established a credit card through Capital One Bank for use by Jason Malkin (hereinafter referred to as "the Jason Malkin card") and Scott Jungwirth (hereinafter referred to as the "Scott Jungwirth card") to cover expenses associated with the marijuana distribution activities; i.e.: Bob Malkin appears to be the primary account holder, with Jason Malkin and Scott Jungwirth being authorized users on the account.

  a. The "Account Information Sheet" for Jungwirth lists his email as **"bobmalkin@gmail.com."**

  b. The address appearing on the monthly statements is: ROBERT K. MALKIN, STE 101-545, 226 W. Ojai Ave., Ojai, CA 93023.

  c. Most of the payments against the account balances are listed under Robert Malkin's name.

106. Consistent with other financial transactions conducted by DTO members, the payments against the account balances were made with currency equivalents; i.e., money orders, whose purchases appear to have been structured to avoid the need to provide identification to the seller of the money orders. Most of these money orders list Robert Malkin as the purchaser of the money orders and the handwriting appears similar on most of the money orders. Records of some

22

of the money orders were found in Sydney Malkin's residence when it was searched on July 25, 2018.

107.    The first known transaction on the Jason Malkin card occurred on September 13, 2016 for a flight in the name Jason Malkin from Los Angeles to Washington D.C. It is noted that an expenditure on another account of Robert Malkin showed expenditure for a flight in the name Robert Malkin from Los Angeles to Baltimore on September 12, 2016.

108.    Jason Malkin incurred travel expenses associated with the cities of Garberville, CA; Milwaukee, WI; Pittsburgh, PA; Germantown, MD; etc. These expenses were most prevalent from September 2016 through July 2017, but others existed.

109.    Scott Jungwirth initially incurred expenses, on the Scott Jungwirth card, associated with Redding and Garberville, CA; however, he began incurring more expenditures associated with MD beginning in August 2017, which corresponds to the July 2017 move-in date of the Germantown, MD stash house. Some of his expenditures include large-value vehicle rentals, consistent with driving across the country.

110.    Credit card expenditures became minimal beginning in January 2018, which corresponds to Habib's arrest.

111.    As late as April 4, 2018, Sydney Malkin used email address **malkinsydney@gmail.com** to communicate with accountants at the accounting and tax preparation firm of Bratton, McMorrow & Associates. Using **malkinsydney@gmail.com**, Sydney Malkin responded to a question by the accountant regarding a $66,400 deposit into one of Bob Malkin's bank accounts, which was not recorded in the Malkin's accounting records (Quickbooks), as it should have been. Via **malkinsydney@gmail.com**, Sydney Malkin stated: "It

23

is the payoff [of] the Woodford Note, however I do not see it in the chart of Accounts [; i.e., the loan was not recorded in Quickbooks]. It was [a] purchase that he did with M[] S[] [sic] – they bought it 50/50 but Bob paid for it and M[] did the rehab work. Bob did a Note for $66,400 in exchanged [sic] to sell his 50% to Mike." The accountant then asked whether Bob Malkin bought the "50% share for $66,400," and Syndney Malkin replied via **malkinsydney@gmail.com**, "The full 100% was purchased for the $66,400 Note." Based on their training, experience, and familiarity with this investigation, case agents believe that as the CEO of Malkin Properties, Inc. and Malkin Properties, LLC, Sydney Malkin used her email address of **malkinsydney@gmail.com** to conduct business operations, including to further conceal her father's drug proceeds.

112.    A review of Robert Malkin's Chase Bank checking account *0404 revealed the following:

a.      Six checks, made payable to World-Wide Freight, 2115 Stein Dr., Suite 304, Chattanooga, Tennessee were drawn against Robert MALKIN's account #0404. These checks were dated from December 2, 2015 and July 13, 2017; and ranged in amounts from $3,900 to $4,900. The Memo section on check number 9775, dated August 2, 2016, states "COD Payment– Santa Paula CA–MD". (Note: Lev REYS' telephone tolls reveal that Reys was in contact with 423-760-4300, listing to Worldwide Freight's Carrier Division,2115 Stein Dr. Suite 304 Chattanooga, Tennessee.)

113.    A review of Lev Reys Citibank checking and credit card accounts, both personal accounts in his name and business accounts for limited liability corporations (ROI Properties PIT LLC, ROI PROPS JAX LLC), all having a mailing address of 12203 Hartsook St., Valley Village,

24

CA, revealed the following:

        a.      Reys checking account *4331 showed 3 money order deposits in 2015 totaling $3000, 2 in 2016 totaling $5600 and 50 in 2017 totaling $47,015. Of the 50 in 2017, 3 listed the alleged purchaser as "Robert Malcom" totaling $2800 and 10 with "Robert/Bob Malkin" totaling $9800.

        b.      The "post office #" appearing on most of the money orders reveals that they were purchased in the greater Los Angeles, CA area. However, there is one significant exception; i.e., the $1,000 money order deposited into Reys' account on November 14, 2017 was purchased at post office # 53007 on November 9, 2017, which is in the greater Milwaukee, WI area. Reys' CitiBank credit card #2764 transactions reveal that card was used in the Milwaukee, WI area on that date.

        c.      The deposited money orders appear to have the same, or very similar, hand-printing, in that the printing bears a back-slanted tilt. A visual comparison of the hand-printing on the money orders to that found on the signature cards for Lev Reys' business checking accounts at CitiBank; i.e., ROI PROPS PIT, LLC and ROI PROPS JAX, LLC, reveals significant similarities. Also, most of the money orders indicate the proceeds were "loans" or "loan repayments." Thus, it appears that Reys may have been attempting to launder currency through his checking account by (1) using currency to purchase the money orders, recording nominee names as the persons who purchased the money orders and provided them to REYS, and (3) depositing those money orders into REYS' checking account; thereby attempting to conceal the nature, source, ownership, or control of the proceeds.

        d.      Deposited items into the checking account included 6 deposits totaling

$39,890 between February 2015 and October 2017 from businesses owned by Robert Malkin (Fresno Valley Partners LLC, Robert K. Malkin & Associates Inc., and Malkin Properties LLC), with the largest deposit being $35,000 on May 28, 2016.

       e.      Withdrawals from the checking account included 10 totaling $91,682.02 between June 2015 and September 2017 payable to businesses of Robert Malkin (Malkin Properties, Robert K. Malkin & Associates Inc., Malkin Properties Inc.) and 1 to Malkin's son, Andrew Malkin.

       f.      Nearly all of these transactions between Reys and the business of Robert Malkin were associated with real properties in the Pittsburgh, PA area. The four transactions taking place on or about June 8, 2015 indicate that Lev REYS purchased four real properties from the MALKINS at a cost of approximately $88,000. These transactions were preceded by two currency deposits of $4,000 each and a $10,000 "loan" from Alice Reys.

       g.      Similarly, a $4,500 payment by Reys to TD Ameritrade on April 15, 2015 as an IRA Deposit was preceded by $3,710 currency deposit.

       h.      Reys Citibank credit card *2764 obtained in 2017 revealed that the monthly payments were most likely paid utilizing money orders as they were not traceable to any of Reys checking accounts and the balances were paid in multiple transactions, i.e. $3058.23 payment in September 2017 paid with two $1000 payments, one $500 payment and one $558.23 payment, a $4000 payment in October 2017 paid with four payments of $1000 and a $5565.34 payment in November 2017 paid with five $1000 payments and one $655.34 payment.

       i.      The credit card transaction for *2764 also showed multiple travels related to this marijuana trafficking conspiracy.

26

j.      One trip occurring September 15-23, 2017 showed travel to Garberville, CA, (9/15/17) back to Los Angeles, (9/17–9/18/17), flight to Milwaukee with rental car in Milwaukee (9/21/17), flight to Baltimore with rental car (9/22/17), and flight to Los Angeles (9/23/17). This trip coincided with time period of rental application at stash location at 4100 W. Hillcrest in Milwaukee.

k.      Two trips to Garberville (9/24/17 and 10/4–10/6/17) with flight from Los Angeles to San Francisco and return flight on same day (9/24/17) with gas station expenses in Garberville on that date and 2 night hotel stay (10/4-10/6/17) in Garberville, with associated travel expenses back to Los Angeles on 10/6-10/7/17.

l.      A trip to MD (9/28/10/2/17) with flight to Baltimore and return flight expense indicated.

m.      A trip to PA with hotel stay and rental car charges (10/10-10/12/17), a hotel charge in Hagerstown, MD (10/11/17), flight from Pittsburgh to Baltimore with rental car and hotel stay (10/13/17), and possible 2 return flights charged Baltimore to Los Angeles (10/14/17).

n.      A trip to Chicago/Milwaukee (10/18-10/19/17) with flight from Los Angeles to Chicago with rental car (10/18/17) and two charged return flights from Chicago to Los Angeles (one flight for 10/19/17 & the other 10/20/17). On October 20, 2017, Milwaukee area charges exist. This trip coincides with the rental start date at the stash location at 4100 W. Hillcrest Dr., Milwaukee, WI.

o.      A trip to Garberville, Milwaukee, and MD (11/1-11/11/17) with rental car in San Francisco (11/1/17), 2 hotel charges in Garberville with dates of stays for the separate charges of (11/1-11/6/17) and the other (11/4-11/6/17), charges in Los Angeles (11/5/17), a flight from Los Angeles to Chicago with rental car (11/8/17), the Home Depot charge in Milwaukee

27

(11/9/17), and flight from Chicago to Baltimore (11/11/17). This trip coincides with the stash location rental at 7992 N. 107th St. #6, Milwaukee, WI.

## Travel Information

114. The flight, rental car, financial information, and cellular call and location data establish the DTO's known travels in furtherance of the conspiracy to include travel to Los Angeles, San Francisco, Sacramento and Garberville, CA, Milwaukee, WI, MD, and Washington D.C.

115. The airport in San Francisco is the last major airport in closest proximity to the Garberville/Humboldt County area of northern CA. In addition, Sacramento, CA is known as a major trucking/shipping location for shipments of marijuana emanating from northern CA.

116. A review of received subpoenaed airline flight records and rental vehicle records revealed the following:

    a. Habib flew 21 times from the MD area in 2015 and 2016 with 15 flights to San Francisco, 3 to Sacramento, and 3 to Los Angeles. Approximately 7 flights did not have corresponding outbound/inbound flights, most being flights occurring from Baltimore to San Francisco. In 2017, Habib flew 17 times, most departing from Milwaukee with 1 flight to San Francisco, 9 to Sacramento, 3 to Los Angeles, and 4 flights to Washington DC. Two flights did not have corresponding outbound/inbound flights, one flight from Milwaukee to Washington D.C. and one from Los Angeles to Milwaukee.

    b. Approximately 18 of Habib's airfares were paid by Seth Jacobs, including 4 when Habib flew with other individuals and 15 times that Jacobs flew with Habib, all of which occurred in 2015 and 2016.

28

c.      One of the airfares paid for by Jacobs was for Habib, Arbi, and a third individual, and one of Habib's flights was paid for by Hagos.

d.      Jacobs had 11 flights in 2015/2016 from the MD area with 9 flights to San Francisco and 2 to Los Angeles. Five flights to San Francisco had no located corresponding return flight.

e.      Omar had one flight in 2016 with Habib from MD to San Francisco.

f.      Jungwirth had one flight from San Francisco to Los Angeles in 2016 and one flight from Redding, CA to Baltimore in 2017.

g.      Reys had 14 flights in 2017 with 8 to Washington D.C./Baltimore, 1 to San Francisco, and 5 to Milwaukee/Chicago, all of which occurred between September 2017 and January 2018.

h.      Robert Malkin had 6 flights in 2016 with 5 to Washington D.C./Baltimore and 1 to Sacramento. In 2017, Malkin had 11 flights, with 3 to Washington D.C./Baltimore, 4 to Milwaukee/Chicago, 1 to San Francisco, and 3 to Sacramento. Most of Malkin's flights originated from the Los Angeles area of Las Vegas and approximately 3 had no corresponding return flights, including 2 in September 2016 when Malkin flew to Baltimore and one in August 2017 when he flew to Milwaukee.

120.    Rental vehicle records obtained revealed the following:

a.      Habib had 8 rentals all occurring in 2015, with 4 rented in San Francisco and returned in Alexandria, Virginia, 1 in San Francisco returned in Reno Nevada, 1 in Reno and returned in Washington D.C., and 1 rented and returned in Reno.

b.      Jacobs had 7 rentals, all in 2016, with 5 rented and returned in San Francisco

29

and 2 rented and returned in Sacramento.

   c.  Reys had 14 in 2017, with 2 in Milwaukee, 10 in Baltimore, and 2 in Chicago all of which were returned to the same city as rented and one rented and returned in 2018 in Baltimore.

   d.  Jason Malkin had 15 in 2017, 7 in Milwaukee with 6 returned in Milwaukee and 1 returned in Pittsburgh, 2 in Pittsburgh that were returned in Baltimore, 1 in Chicago that was returned in Pittsburgh, and 5 rented and returned in Baltimore. For each rental, Jason Malkin was listed as the renter, and on file for each rental was his driver's license and cellular telephone number 310-948-4015, a number law enforcement knowns Jason Malkin to currently use;

   e.  Hagos had 3 in 2016, 1 from Milwaukee, 1 in Washington D.C., and 1 in Sterling, Virginia, all of which were returned to the same cities; in 2018, Hagos also had 1 which was rented and returned in Washington D.C.

   f.  Jungwirth had 1 rental in 2016 in Redding and 2 in 2017 in Baltimore and Sacramento, all returned to the same cities.

   g.  Robert Malkin had 7 in 2016 with 4 in Baltimore/Washington D.C., 1 in Redding, and 2 in Sacramento, all of which were returned to the same cities except 1 from Sacramento returned to Los Angeles; in 2017, Malkin rented 17, 2 in Milwaukee, 6 in Sacramento, and 9 in Baltimore/Washington D.C. All were returned to the same cities except 3 from Sacramento had 2 returns in San Francisco and 1 in Los Angeles; in 2018 Malkin had 3, with 2 in Sacramento and 1 in San Francisco, all returned to the same cities.

  121. On at least eight different occasions between January 2017 and September 2017, Robert Malkin and Jason Malkin incurred expenses for airline flights and/or rented vehicles in

30

Milwaukee. Some of those rentals coincided with the stash house rental time periods in Milwaukee. For example, on February 25, 2017, the Jason Malkin card incurred an rental car expense in Milwaukee, WI. The following day, on February 26, 2017, the Jason Malkin card incurred an expense for Jason Malkin to fly from Los Angeles, CA to Milwaukee, WI. On February 28, 2017, the rental application in the name of Robert K. Malkin for the Ravinia Drive stash house in Greenfield, WI, as well as proof of Robert Malkin's income, were submitted through **bobmalkin@gmail.com**. On March 1, 2017, the Jason Malkin card incurred another rental vehicle expense in Milwaukee, WI. Also on March 1, 2017, Habib flew from Milwaukee, WI to Sacramento, CA, a transportation hub for the shipment of marijuana in northern CA. Also on March 1, 2017, Robert Malkin rented a vehicle in Sacramento and returned it one day later, which coincided with Habib's departure from Sacramento back to Milwaukee.

122.   On numerous other occasions in 2017, Lev Reys, Robert Malkin, Jason Malkin, and Scott Jungwirth rented vehicles in Baltimore, MD.

123.   It is noted that the airports in Washington D.C. and Baltimore, MD are the same proximate distance from the stash house in Germantown, MD and the warehouse hangar in Hagerstown, MD. The CI also advised that the defendants would utilize either airport when they traveled to MD.

124.   On October 6-8, 2016, expenditures on the Robert Malkin credit card issued to Jason Malkin were incurred at a hotel in Garberville. It is noted that Habib and Jacobs flew from Baltimore to Los Angeles on October 7, 2016.

125.   In November 2016, Robert Malkin incurred expenses for a flight in his name from Los Angeles to Pittsburgh, PA and a rental car in Pittsburgh, which Malkin returned in Miami,

31

Florida on November 19, 2016. On November 19, 2016, Habib and another individual flew to Miami and returned on November 19. On November 20, Robert Malkin incurred an expense for a flight from Miami to Los Angeles.

126.    On December 6, 2016, Robert Malkin flew from the Los Angeles area to Sacramento and rented a vehicle in Sacramento. On that same date, the credit card in the name Jason Malkin incurred expenses at a location in Sacramento and one in Redding. On December 6 and 7, the card in the name of Scott Jungwirth incurred expenses in Redding. On December 7, Habib and Jacobs flew from Baltimore to San Francisco, and Jacobs rented a vehicle in San Francisco, which was returned on December 9. On December 8, the card in the name Jason Malkin incurred an expense for a flight in the name Robert Malkin on December 11 and a flight for Jason Malkin from Los Angeles to Pittsburgh but the card continued to incur expenses in northern CA until December 12. On December 9, Habib and Jacobs flew from San Francisco to Washington D.C.

127.    On January 9, 2017, Robert Malkin incurred an expense in Milwaukee and on January 10, the card in the name Jason Malkin incurred expenses for a flight from Los Angeles to Milwaukee and a rental car with a return in Pittsburgh. On January 11, Robert Malkin rented a vehicle in Pittsburgh and then flew from Pittsburgh to Los Angeles.

128.    On other dates in January and February, 2017, the Jason Malkin card incurred expenses on 3 different occasions in Milwaukee. On one occasion, the Jason Malkin card incurred expenses chronologically: first in Milwaukee, then Germantown, MD, then a return in Washington D.C. of a vehicle rented in Milwaukee, and finally, an expense for a flight from Washington D.C. to Los Angeles. On February 3, 2017, Habib flew from Milwaukee to Washington D.C., and one

32

day later, the Jason Malkin card incurred expenses within the following week for a flight from Los Angeles to Milwaukee with another rental vehicle expense.

129.    On July 16, 2017, Robert Malkin rented a vehicle in Washington D.C., which he did not return until July 27, 2017. The Jason Malkin card incurred an expense on July 17, 2017 for a rental car from Milwaukee, with a return date of the same day, July 17, 2017, in Chicago, IL. The following day, July 18, 2017, the Scott Jungwirth card incurred an expense to fly from Redding, CA to Baltimore, MD, while the Jason Malkin card incurred an expense to fly from Baltimore, MD to Los Angeles, CA. This timeline coincides with the July 17, 2017 move-in date for the stash house located in Germantown, MD, which was rented in the name of Robert Malkin. Based on these records, law enforcement believes that Robert Malkin, Jason Malkin, and Scott Jungwirth were present in MD to assist with establishing the Germantown stash house.

130.    A review of a Lev Reys credit card accounts, including Citibank account statements, revealed that Reys flew to Milwaukee from Los Angeles on September 19, 2017, and then from Milwaukee to Baltimore on September 22, 2017. Reys then flew from Baltimore, MD to Los Angeles on September 23, 2017. At the same time, Robert Malkin was also present in Milwaukee. Historical cell-tower information placed Robert Malkin in Milwaukee from September 19-21, 2017. A review of flight records revealed that on September 22, 2017, Robert Malkin traveled from Milwaukee to Baltimore – the same date that Reys flew to Baltimore.

131.    On November 8–9, 2017, Reys' credit card also incurred charges from a Holiday Inn hotel and Home Depot store in the Milwaukee area. Records received from the Holiday Inn revealed Reys rented a room the night of November 8 into November 9, 2017. A review of the transaction receipt from home Depot from November 9, 2017, revealed Reys purchased various

33

household cleaning items and supplies including lockset(s), the same type of air fresheners observed at 4100 W. Hillcrest #207 and 7992 N. 107th St., #6, and latex gloves.

132.    The charge card accounts and airline records show a pattern in 2017 of Robert and Jason Malkin travels overlapping with believed shipments of marijuana from CA to Milwaukee/MD and arrangements with Reys and Habib to establish the stash locations in Milwaukee WI and Germantown/Hagerstown, MD.

133.    On June 4, 2017, Jacobs and Habib were stopped by the Milwaukee County Sheriff's Department in a Nissan Maxima, known to be driven by Habib. Jacobs, a rear passenger in the vehicle, was issued a citation for possession of marijuana. The report indicates there were more occupants of the vehicle other than Habib and Jacobs but does not list their names or seating positions. The report stated Jacobs' address was 6504 Osprey Point Ln., Alexandria, VA and that his address was verified.

134.    Subpoenaed credit card and hotel records revealed Jacobs and Hagos both having incurred charges on credit cards in their names for InterContinental Hotels in Milwaukee with hotel records showing two rooms rented under the name Colin Jacobs (Colin is middle name of Seth C. Jacobs) on December 12, 2016, and a room rented under the name Nahom Hagos for 2 nights, December 12 and 13, 2016.

135.    Omar traveled with Habib to northern CA on July 24, 2016; the flights were paid for by Jacobs.

136.    Preservation letters were sent on behalf of the email addresses identified in Attachments A-1. In general, an email that is sent to a Google subscriber is stored in the subscriber's "mail box" on Google servers until the subscriber deletes the email. If the subscriber

34

does not delete the message, the message can remain on Google servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google's servers for a certain period of time.

137. On Augsut 7, 2018, a federal grand jury sitting in the Eastern District of Wisconsin returned a superseding indictment against Habib, Robert Malkin, Jacobs, Jason Malkin, Reys, Omar, Markowski, Birault (drug conspiracy only), Jungwirth (drug conspiracy only), Arbi (drug conspiracy only), Hagos (drug conspiracy only), and Cook (money laundering only), charging them with the Subject Offenses.

## BACKGROUND CONCERNING EMAIL

138. In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("email") access, to the public. Google allows subscribers to obtain email accounts at the domain name gmail.com, like the email accounts listed in Attachments A1-3. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

139. A Google subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to

35

emails), and other files, on servers maintained and/or owned by Google. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

140. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

141. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address

36

information can help to identify which computers or other devices were used to access the email account.

142. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

143. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the

37

physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

144.    Based on the above information, there is probable cause to believe that the email accounts **bobmalkin@gmail.com**, **larrygoeshardaf@gmail.com**, and **malkinsydney@gmail.com** possesses evidence regarding the Subject Offenses. **bobmalkin@gmail.com** and **larrygoeshardaf@gmail.com** were used to correspond with the property manamgement company regarding two known locations utilized by Josef K. Habib in Milwaukee, Wisconsin to further the DTO. Furthermore, there is probable cause to believe that **malkinsydney@gmail.com** was used to conceal the nature, source, location, ownership, or control of the proceeds derived from the Robert Malkin DTO by using the drug proceeds to purchase business assets and pay business expenses.

9.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google, who will then compile the requested records at a

38

time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## <u>ATTACHMENT A-1</u>

Property to Be Searched

This warrant applies to information associated with **bobmalkin@gmail.com**, that is stored at premises owned, maintained, controlled, or operated by Google, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California.

1

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Google (the "Provider")**

To the extent that the information described in Attachments A1-3 is within the possession, custody, or control of the Provider, regardless of whether such information is stored, held or maintained inside or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for the account listed in Attachments A1-3:

a.      The contents of all emails associated with the account from January 1, 2017 to the present date, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

1

e. All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken;

f. All information available from Google Web & App Activity associated with the account;

g. All communications, in whatever form, and other information from Google Hangouts associated with the account;

h. All information and documents from Google Docs associated with the account; and

i. All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Google.

j. For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

The Provider is hereby ordered to disclose the above information to the government within fourteen days of the issuance of this warrant.

**I.      Information to be seized by the government**

All information described above in Section I that constitutes evidence and instrumentalities of violations of the Subject Offenses, including, for the account listed on Attachments A1-3, information pertaining to the following matters:

a. The identity of the person(s) who created or used the account;

b. Electronic drug or money ledgers, drug distribution or customer lists and related identifying information, drug supplier lists (including names, addresses, phone numbers, or any other identifying information); correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed lists of customers and related identifying

2

information; types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions; types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      c.     Electronic telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, e-mails, documents, and other items or lists reflecting names, addresses, telephone numbers, addresses, and any communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

      d.     Records, items, and documents stored on the accounts reflecting travel for the purpose of participating in drug trafficking activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel;

      e.     Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, UPS, FedEx, and other mail service receipts and records, bank statements, checks, credit card records, safe deposit box records, records and receipts and rental agreements for storage facilities, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances.

      f.     Photographs, videotapes or other depictions of assets, co-conspirators, controlled substances, or other activities related to drug trafficking or money laundering.

      g.     Records of Internet Protocol addresses used; records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user typed web addresses.

3

h.     Any and all location data and information stored with the account identified in Attachments A1-3 that relate to the physical location of any devices associated with the two accounts between July 16, 2017, and present date. This data and information may include, but is not limited to, routes taken, check in data, points of interest selected, map searches, Wifi scans, GPS data, and any other information kept by Google Timeline and Google Dashboard services.

i.     Communications related to a Dropbox account;

j.     Databases or files containing tax-related information or personal identifiable information for multiple individuals; and

k.     Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information) obtained through the account.

4